In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-3313

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES MORGAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:24-cr-00006 — **James D. Peterson,** *Chief Judge.*

ARGUED NOVEMBER 12, 2025 — DECIDED JUNE 25, 2026

Before ROVNER, PRYOR, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* For years, Defendant James Morgan built up a cache of dangerous, largely homemade weapons, documenting his growing arsenal on social media. He also posted about using his weapons against government officers, advocated for violence, and spewed antisemitic and racist threats. Citing Morgan's online activity, federal agents sought a warrant to search his trailer and other property. A magistrate judge in the Eastern District of Wisconsin issued the

warrant. Officers executed it and recovered pipe bombs fitted with construction-grade nails from Morgan's trailer in the Western District of Wisconsin. A grand jury indicted Morgan for unlawfully possessing unregistered destructive devices in violation of 26 U.S.C. § 5861(d).

Morgan moved to suppress the pipe bombs, arguing the Eastern District magistrate judge lacked the power under Federal Rule of Criminal Procedure 41(b) to issue a warrant for execution upon Morgan's trailer in the Western District. He also moved to dismiss the indictment, arguing the charging statute is unconstitutional because it exceeds Congress's enumerated taxing authority. The district court denied both motions, and Morgan pled guilty while reserving his right to appeal. Because the warrant affidavit supplied a sufficient basis to conclude that Morgan's activities met the statutory definition of domestic terrorism, Rule 41(b)(3) authorized the magistrate judge to issue the extra-district warrant. And Morgan's taxing power theory is foreclosed by Supreme Court and Circuit precedent. We affirm.

## I. Background

Morgan was on state and federal law enforcement's radar for several years before he was arrested and charged in 2023. We start with this history because it informs Morgan's arguments about the warrant application and the magistrate judge's jurisdiction. We then turn to the details of the warrant and Morgan's indictment and prosecution.

We also note at the outset that much of Morgan's social media activity, while vile, is protected speech. But the First Amendment does not immunize the conduct underlying his crime of conviction. And the magistrate judge who issued the

warrant had ample evidence of criminal activity beyond First Amendment-protected speech.

### A. Factual Background

In 2019, Morgan moved from Illinois to Janesville, Wisconsin to care for his father, who had lung cancer. Morgan enrolled at the University of Wisconsin-Whitewater to study chemistry, and in June 2022, after his father's passing, he moved to an apartment in Whitewater to be closer to school. He later paused his schooling for financial reasons and, in July 2023, moved into a travel trailer, which he parked outside of a McDonald's in Janesville where he worked.

Morgan was an avid social-media poster. In 2019, he posted videos about making smoke grenades and a sulfuric acid sprayer. His posts were also ideological: Morgan held anti-government views—and became further emboldened in those beliefs after moving in with his father—that he aired online.

Morgan's online activity drew authorities' attention. Local and state police investigated him, and in March 2020, Janesville police issued a statewide alert warning that Morgan had acid throwers, homemade sulfur-oxide grenades, and firearms. The FBI assisted in disseminating this warning about Morgan's activities, which also included investigators' assessment that Morgan did not pose an imminent, specific threat. Further, in 2019 and 2020, law enforcement uploaded two incident summaries about Morgan to a nationwide tracking system accessible by state and federal law enforcement agencies. Those summaries noted Morgan's interest in experimenting with and manufacturing chemical weapons but concluded that Morgan posed no "threat to life" at that time.

In July 2022, the FBI reopened its investigation of Morgan based on concerns about his social media posts. Agents interviewed Morgan's family member, who stated that Morgan's violent rhetoric had declined since his father's death in 2021, and former co-workers, who reported that Morgan had not made any threats of violence. The FBI also obtained Morgan's posts from Gab (a social media platform), where he expressed hatred for various minority groups, including African Americans, Jews, and immigrants. In a May 2023 Gab message to his girlfriend, Morgan wrote that if the government ever came "for the guns," he would create a large amount of chlorine gas and "defeat them without firing a single shot."

In December 2023, as part of this renewed investigation, the FBI sought a search warrant from a magistrate judge in the Eastern District of Wisconsin. Included in the warrant affidavit were more than twenty photos and screenshots of Morgan's social media posts where he demonstrated how to build homemade weapons and made explicit calls for violence. For instance:

– In October 2019, Morgan discussed "forming my own militia" called "The New American Minutemen" and calling for his followers to "dust off our guns" and answer his "call to arms."

– In November 2019, Morgan posted a Facebook video about how to create and use an acid sprayer. Along with the video, he posted, "People should not be afraid of their government, governments should be afraid of their people. So here's how you make a device that shoots sulfuric acid!"

- In April 2022, Morgan took a photo of supplies to make destructive devices, including smokeless powder, cardboard containers, hobby fuse, glue, and nails.

- In May 2022, Morgan posted a video showing the components and design used to create a gasoline flamethrower, which he was "finishing up."

- In May 2023, as described above, Morgan sent messages to his girlfriend on Gab describing his willingness to use chlorine gas against government agents.

- In November 2023, Morgan posted: "the one thing above all other things they nail into your head over and over from the youngest age is 'violence is not the answer.' You know what? It literally is an answer."

In the warrant affidavit, the government invoked Federal Rule of Criminal Procedure 41(b)(1), (2), and (3)—provisions prescribing the proper venue for a warrant application to a magistrate judge—as the bases for the magistrate judge's authority to issue the warrant. It also identified the mobile trailer Morgan was living in, which had been seen by law enforcement in both the Eastern and Western Districts of Wisconsin, along with Morgan's storage unit in the Eastern District.

## B. Procedural Background

Based on the warrant affidavit, a magistrate judge in the Eastern District of Wisconsin issued a warrant to search Morgan's person, trailer, pick-up truck, and storage unit. The warrant authorized law enforcement to search for evidence of federal crimes, including 26 U.S.C. § 5861 (receiving,

possessing or making unregistered firearms or destructive devices).

Agents executed the warrant on December 21, 2023. Agents searched Morgan's trailer (then in Janesville, in the Western District) and found six unregistered destructive devices—homemade pipe bombs—in a safe. Four of the six pipe bombs had construction-grade nails glued to them. An image of one of the recovered devices is below:



In January 2024, a Western District grand jury indicted Morgan on one count of unlawfully possessing destructive devices not registered to him in the National Firearms Registration and Transfer Record, a violation of 26 U.S.C. § 5861(d).

Morgan moved, unsuccessfully, to suppress the evidence seized from his trailer, arguing that the warrant was invalid as to his trailer in Janesville (in the Western District) because "[a] magistrate judge generally lacks freewheeling power to

authorize searches outside the district." He further contended that the government's investigation into him was not "an investigation of domestic terrorism" under Rule 41(b)(3), an exception to the prohibition on magistrate judges issuing extra-district warrants. To that end, Morgan averred that the affidavit intentionally or recklessly omitted facts that would have established the inapplicability of Rule 41(b)(3) in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). He also moved to dismiss the indictment in its entirely on the basis that the charging statute, 26 U.S.C. § 5861(d), is unconstitutional because it exceeds Congress's enumerated taxing authority.

The district court denied both motions. It rejected Morgan's motion to dismiss because binding circuit precedent foreclosed his constitutional argument. On suppression, the district court found the affidavit satisfied both a "reason to believe" standard (requiring less than probable cause) and the higher probable cause standard. The affidavit sufficiently supported—under either standard—that Morgan was engaged in domestic terrorism to support the magistrate judge's authority to issue an extraterritorial warrant under Rule 41(b)(3).

In April 2024, Morgan pled guilty pursuant to a conditional plea agreement, preserving his right to appeal the denial of his pre-trial motions. The district court sentenced him to 24 months' incarceration and three years' supervised release. Morgan appealed.

## II. Discussion

On appeal, Morgan argues the district court erroneously denied his motions to suppress and dismiss. We disagree. The magistrate judge had the authority to issue the out-of-district

warrant because the affidavit supplied ample basis to conclude that Morgan was engaged in domestic terrorism. And as Morgan concedes, his constitutional argument for dismissing the indictment is foreclosed by our precedent.

### A. Suppression for Lack of Authority under Rule 41(b)

We review the district court's factual findings in denying Morgan's suppression motion for clear error and its legal conclusions (along with mixed questions of law and fact) *de novo*. *United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022). We will not disturb the district court's factual findings unless, upon consideration of the full body of evidence, we "cannot avoid or ignore a definite and firm conviction that a mistake has been made." *Id.* (cleaned up). Recognizing that suppression motions often call for a fact-specific inquiry, we give special deference to the district court's credibility determinations. *See United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009).

#### 1. Rule 41(b)(3)'s Standard of Proof

A magistrate judge's authority to issue a warrant is generally confined to persons or property located in the district (either permanently or at the time of the warrant's issuance) where the magistrate sits. *See* Fed. R. Crim. P. 41(b)(1)–(2). But, as an exception to that general rule, "a magistrate judge—in an investigation of domestic terrorism …—with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for … property … outside that district." Fed. R. Crim. P. 41(b)(3). Rule 41(a)(2)(D) defines "domestic terrorism" by cross-reference to 18 U.S.C. § 2331(5) as "activities that":

(A) involve acts dangerous to human life that are a vi-
olation of the criminal laws of the United States or of
any State;

(B) appear to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by in-
timidation or coercion; or

(iii) to affect the conduct of a government by mass
destruction, assassination, or kidnapping; and

(C) occur primarily within the territorial jurisdiction of
the United States[.]

Morgan contends the warrant affidavit failed to suffi-
ciently establish that he was engaged in domestic terrorism,
rendering the magistrate judge without authority to issue the
extra-district warrant under Rule 41(b)(3).[1] That purported
defect, according to Morgan, requires suppression of the evi-
dence gathered from his trailer. This raises a question of first
impression in our Circuit: what standard—probable cause or
something less—must the government satisfy to establish

---

[1] We focus only on Rule 41(b)(3). Rule 41(b)(1) authorizes only same-
district warrants, and all agree the warrant here was executed at Morgan's
trailer outside the issuing court's district. Rule 41(b)(2) is inapplicable be-
cause it authorizes extra-district warrants only where the "property is lo-
cated within the district *when the warrant is issued* but might move or be
moved outside the district *before the warrant is executed*" (emphasis added).
Here, the affidavit presented to the Eastern District magistrate judge re-
ported that Morgan's trailer had already been moved from Whitewater
(Eastern District) to Janesville (Western District) before the warrant is-
sued.

venue for an extra-district search warrant based on the existence of a domestic-terrorism investigation?

Few courts have addressed this issue, and we are aware of no on-point cases from our sister circuits. The parties point us to *Matter of One Apple iPhone Smart Phone*, an out-of-circuit district court case holding that Rule 41(b)(3) requires the government to present facts establishing a "reason to believe" that (1) there is an investigation of domestic terrorism; and (2) the domestic-terrorism activities may have occurred in the issuing court's district. 628 F. Supp. 3d 155, 161–62 (D.D.C. 2022). It drew the "reason to believe" standard from *United States v. Thorne*, a case assessing venue under Rule 41(b)(2). 548 F. Supp. 3d 70 (D.D.C. 2021), *aff'd on other grounds*, *United States v. Thorne*, 169 F.4th 1117 (D.C. Cir. 2026). *Thorne* held that "[r]eason to believe" is "not a particularly high standard" but requires "specific and articulable facts that, taken together with rational inferences drawn therefrom, provide a particularized and objective basis for thinking" that the venue provision is satisfied. *Id.* at 127 (citing *United States v. Bohannon*, 824 F.3d 242, 255 (2d Cir. 2016)). The *One Apple iPhone* court thus concluded that the reason-to-believe standard demands less than a showing of probable cause. 628 F. Supp. 3d at 161.

While the *One Apple iPhone* court made some persuasive points, we need not resolve whether Rule 41(b)(3) requires a lesser showing than probable cause because, here, the government would prevail even under a probable-cause standard. *See United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009) (declining to decide "whether 'reasonable belief' requires probable cause or something less" because "the police had enough evidence to easily satisfy a probable cause standard"). The day may come when we must resolve the precise

standard, and parties would be wise to raise the issue in the appropriate case. But we need not do so today.[2]

### 2. The Magistrate Judge's Authority to Issue the Warrant

"The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Probable cause requires nothing near certainty; instead, it demands a "substantial chance of criminal activity." *United States v. Reichling*, 781 F.3d 883, 887 (7th Cir. 2015) (citation omitted). The government needs neither "an actual showing of [criminal] activity," nor "a probability that exceeds 50 percent." *Id.* (citation omitted).

Here, we conclude the magistrate judge had authority under Rule 41(b)(3) to issue the extra-district warrant because the affidavit, construed holistically, supplied probable cause to believe the investigation involved domestic terrorism. To reach that conclusion, we assess the affidavit in light of section 2331(5)'s domestic-terrorism elements. The key issue is whether the affidavit supplied a substantial chance that Morgan's activities "appear[ed] to be intended" to effectuate the

---

[2] Neither party challenged the *One Apple iPhone* court's application of the reason-to-believe standard in interpreting Rule 41(b)(3)'s requirements. But the district court observed that if Rule 41(b)(3) requires a probable-cause showing, the government had satisfied that higher standard. Generally, we can resolve the issue on the grounds that the warrant meets the probable cause standard because we can affirm on any basis presented in the record. *See United States v. Reaves*, 796 F.3d 738, 741–42 (7th Cir. 2015); *United States v. Fields*, 371 F.3d 910, 916 (7th Cir. 2004).

purposes enumerated in section 2331(5)(B)(i), (ii), or (iii).[3] Any one of these three intent provisions would be sufficient to support the warrant, but the affidavit supplies probable cause as to all three. We discuss romanettes (i), (ii), and (iii) of section 2331(5)(B) in order.

*First*, Morgan's activities "appeared to be intended … to intimidate or coerce a civilian population." 18 U.S.C. § 2331(5)(B)(i). Morgan posted about using his acid throwers against other citizens, demonstrated their ability to damage concrete and burn through clothing, and encouraged others to "chemically burn commies alive and melt their faces off for $10." He targeted for violence specific groups (*e.g.*, Antifa and communists) with which he disagreed. Morgan also touted his acid sprayers' ability to intimidate: he reported that he styled one with yellow and black materials—evoking a bee or wasp—to warn victims "that I'm about to shoot something really nasty at you." And separately, he wrote about lynching African Americans, killing non-citizens, and "addressing" the country's "Jewish problem." These episodes evince sufficient

---

[3] The other elements of domestic terrorism—found in section 2331(5)(A) and (C)—are not reasonably in dispute. Unquestionably, Morgan's conduct "involve[d] acts dangerous to human life" under section 2331(5)(A): The FBI supplied screenshots of Morgan's posts (including photos, videos, and written text) documenting his development of home-made weapons, including various explosives, acid throwers, and chlorine gas. He messaged his girlfriend about lynching African Americans, gassing police officers, and killing non-citizens. And Morgan himself conceded his activities "are a violation of the criminal laws of the United States." 18 U.S.C. § 2331(5)(A). Further, section 2331(5)(C) is plainly met: Morgan built dangerous and offensive weapons "within the territorial jurisdiction of the United States."

intent to intimidate or coerce others consistent with section 2331(5)(B)(i).

*Second*, Morgan sought "to influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(5)(B)(ii). Over the course of several years, Morgan: (1) put out "a call to arms" and told "fellow Americans" to "dust off our guns and do this again," in response to policy differences with the government; (2) demonstrated how to build and use acid throwers and other offensive weapons to make the government afraid; (3) described a plan to use chlorine gas against federal officers, which would make the government "really scared"; and (4) posted that violence "literally is an answer" to the country's problems. As the district court found, Morgan's stated goals were to affect policy regarding education, taxes, the military, and foreign relations. These incidents show Morgan's intent to use dangerous weapons to influence policy within the definition of section 2331(5)(B)(ii).

*Third*, and similarly, the affidavit supported probable cause that Morgan intended "to affect the conduct of a government by mass destruction, assassination, or kidnapping." *Id.* § 2331(5)(B)(iii). Here, we again look to Morgan's messages about using chlorine gas to kill federal agents. Also supporting this element are Morgan's call for the formation of a militia and promoting his acid throwers' potential to instill fear in the government.

Standing alone, it is no crime to identify oneself online as a bigot armed with weapons and holding loathsome views. But we cannot ignore the clear nexus between Morgan's statements and his development of a dangerous arsenal of homemade weapons. He showcased his weapons, encouraging others to follow his lead. And these were offensive weapons—

acid sprayers, flamethrowers, poison gas, shrapnel grenades, and artillery—designed to cause grave harm at scale. We "accord special deference" to the issuing magistrate judge and the district court, *Burnside,* 588 F.3d at 517, and we agree that the affidavit supplied probable cause to support a domestic-terrorism investigation within 2331(5)'s meaning. Rule 41(b)(3) authorized the magistrate judge to issue the warrant.

### B.  Suppression Under *Franks v. Delaware*

Next, Morgan argues that suppression of the warrant's fruits is warranted because the government omitted information from the affidavit that would have made it apparent to the issuing magistrate judge that this was not a domestic-terrorism investigation. We review the factual findings underpinning a district court's denial of suppression under *Franks* for clear error, but relevant legal determinations are reviewed *de novo*. *United States v. Harris*, 464 F.3d 733, 737 (7th Cir. 2006).

To invoke the exclusionary rule under *Franks*, Morgan had to show: (1) the warrant affidavit contained materially false statements or omissions that would alter the probable-cause determination; and (2) in making or omitting the statements, the affiant acted with a deliberate or reckless disregard for the truth. *United States v. Woodfork*, 999 F.3d 511, 516 (7th Cir. 2021) (citations omitted). This is a weighty burden for Morgan to carry. *Id.*

Morgan points to facts omitted from the warrant affidavit that he says undermine the issuing court's probable-cause determination.[4] He further notes that the affidavit omitted the

---

[4] For example, the affidavit included: (1) Morgan's family member's 2019 statement that Morgan's anti-government rhetoric was accelerating

2020 conclusion from state law enforcement that Morgan did not pose "an imminent, specific threat." And he notes that it did not include the database notations from 2019, 2020, and 2022 reflecting the conclusion that Morgan was not a threat to life. Omitting these details from the warrant affidavit might deviate from best practices, but Morgan falls short of the high bar he must clear to mount a successful *Franks* challenge.

We find no clear error in the district court's conclusion that the information omitted from the affidavit was immaterial. Law enforcement had discerned that Morgan's activity had escalated over time, making earlier assessments that he was not an imminent danger (an inherently time-bound determination) of marginal relevance by the time government sought the warrant in 2023. By then, officers had access to Morgan's Gab account in which he threatened to use chlorine gas against federal officers. The opinions of his family member (with whom Morgan did not live) about his apparently deescalating rhetoric were only one data point in a broader set.

Moreover, there is no evidence that the affiant (who specializes in investigating domestic terrorism) had any motive whatsoever to mislead the issuing court. It is the government's duty to supply the full record of necessary background facts to enable the issuing court to make its probable-cause determination. But here, we agree with the district court that

---

but not her 2023 statement that his aggression and rhetoric had since "dramatically declined" after his father's death in 2021; (2) a tipster's statement that Morgan disliked police and would be "going after" them but not that Morgan told the tipster he only had weapons for his own protection; and (3) Morgan's coworker's expression of fear that he would go "postal" but not statements from coworkers that he had never threatened anyone.

the omitted facts would not have prevented issuance of the warrant. Accordingly, we affirm the district court's denial of Morgan's motion to suppress. Because we conclude that the affidavit supported the warrant's issuance, we do not consider the good-faith exception.

## C. Motion to Dismiss

Morgan also argues that the district court should have dismissed his indictment because Congress exceeded its enumerated taxing authority in enacting the charging statute. We review a statute's constitutionality *de novo*. *United States v. Burrows*, 905 F.3d 1061, 1063 (7th Cir. 2018).

Morgan pled guilty "to receiv[ing] or possess[ing] … firearm[s]"—the six homemade pipe bombs—"which [were] not registered to him in the National Firearms Registration and Transfer Record" in violation of 26 U.S.C. § 5861(d).[5] The charging statute is part of the National Firearms Act, codified in the Internal Revenue Code at 26 U.S.C. § 5801 *et seq.*

Congress has the power to lay and collect taxes. U.S. Const. art. I, § 8, cl. 1. In *Sonzinsky v. United States*, the Supreme Court upheld the National Firearms Act as a constitutional exercise of Congress's taxing power. 300 U.S. 506, 513 (1937). The *Sonzinsky* Court rejected the argument that the statute did not levy a "true tax, but a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms, the local regulation of which is reserved to the states because not granted to the national government." *Id.* at 512.

---

[5] Under section 5845(a), a "firearm" includes "a destructive device." The term "destructive device" means "any explosive … not includ[ing] any device which is neither designed nor redesigned for use as a weapon." 26 U.S.C. § 5845(f).

Instead, the Court observed that "a tax is not any the less a tax because it has a regulatory effect." *Id.* at 513. We have applied *Sonzinsky* and have upheld the National Firearms Act as a constitutional taxing measure.[6] *See United States v. Lim*, 444 F.3d 910, 912–14 (7th Cir. 2006) (upholding charges under the statute as to a short-barreled shotgun); *United States v. Copus*, 93 F.3d 269, 276 (7th Cir. 1996) (same for a silencer and destructive device).

Morgan asks us to revisit *Lim* and *Copus* based on *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519 (2012). In *Sebelius*, the Supreme Court upheld the Affordable Care Act's individual mandate—"a tax on not obtaining health insurance"—as a constitutional tax. *Id.* at 570. There, the Court endorsed a functional approach to determining whether a given measure operates as a permissible tax or an impermissible penalty. *Id.* at 565 (supplying factors informing the functional analysis). According to Morgan, the National Firearms Act is an unconstitutional regulatory penalty under *Sebelius*'s functional approach.

We decline the invitation to reconsider *Lim* and *Copus*. *Sonzinsky* squarely controls, and the Supreme Court does not

---

[6] Our sister circuits have uniformly held the same. *E.g.*, *United States v. Dodge*, 61 F.3d 142, 145–46 (2d Cir. 1995) (gun, silencer, and pipe bomb components); *United States v. Grier*, 354 F.3d 210, 212, 215 (3d Cir. 2003) (machine guns); *United States v. Aiken*, 974 F.2d 446, 448–50 (4th Cir. 1992) (short-barreled shotgun); *United States v. Gresham*, 118 F.3d 258, 261–62 (5th Cir. 1997) (pipe bomb); *United States v. Thompson*, 361 F.3d 918, 920–22 (6th Cir. 2004) (Molotov cocktail); *United States v. Village Center*, 452 F.3d 949, 950 (8th Cir. 2006) (sawed-off shotgun); *United States v. Giannini*, 455 F.2d 147, 148 (9th Cir. 1972) (*per curiam*) (sub-machine guns); *United States v. Spoerke*, 568 F.3d 1236, 1245 (11th Cir. 2009) (pipe bombs).

overrule precedent by implication.[7] *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023); *United States v. Rush*, 130 F.4th 633, 636–37 (7th Cir. 2025). Nor are we certain that *Sebelius* disturbed *Sonzinsky* even by implication: *Sebelius* observed that "taxes that seek to influence conduct are nothing new," and favorably cited *Sonzinsky* as an example of the Court upholding "obviously regulatory measures as taxes." *Sebelius*, 567 U.S. at 567. Accordingly, we affirm the denial of Morgan's motion to dismiss.

### III. Conclusion

We AFFIRM the district court's denials of Morgan's motions to suppress the evidence and dismiss the indictment.

---

[7] On appeal, Morgan acknowledged that his argument is foreclosed by Circuit precedent and maintained here for preservation purposes. *See United States v. Robinson*, 62 F.4th 318, 321 (7th Cir. 2023) ("The most we can offer under currently controlling precedent … is that [the defendant] has preserved his argument for further review.").